**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NANCY STERRETT, a single woman, ) | No. 4:09-CV-531-TUC-CKJ |
| ) | |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| SIERRA SOUTHWEST COOPERATIVE ) | |
| SERVICES, INC., an Arizona corporation,) | |
| ) | |
| Defendant. ) | |
| _____ ) | |
| ) | |

Currently pending before the Court is Defendant's Motion for Summary Judgment [Doc. 69].

**I.   FACTUAL BACKGROUND**

Plaintiff brings this case of action based on allegations of both sexual harassment and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), as well as harassment and discrimination based on a disability pursuant to the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"). The Court views the facts, as it must, in the light most favorable to Plaintiff.

*A.   History Prior to Plaintiff's Employment at Defendant Corporation.*

Prior to working for Defendant, Plaintiff was employed at the Pima County Superior Court. *See* Pl.'s Depo.10/27/10, Exh. A to Pl.'s SSOF [Doc. 99] at 37:12-38:3. While working at Pima County Superior Court, Plaintiff worked with an individual named Julian Garcia. *Id.* at 27:9-28:10. Although Plaintiff initially believed there to be only one co-worker named Julian Garcia, she later came to believe that there were two different

1   individuals. *Id.*

2       While Plaintiff worked with Julian Garcia at Pima County Superior Court, they had

3   friendly, flirtatious interactions and conversations. Julian Garcia never said anything

4   threatening to Plaintiff or asked her out on a date. Plaintiff does not recall Julian Garcia ever

5   making any comments about her appearance.

6       Plaintiff believes that the person she refers to as Julian Garcia 1 was following her for

7   an illegitimate purpose and was trying to upset her by doing so. Plaintiff became concerned

8   about some perceived hostility that Julian Garcia 1 allegedly exhibited toward her in the Fall

9   of 2006 while they worked together at the Pima County Superior Court. Specifically,

10  Plaintiff testified that he was giving her angry looks, but does not recall that he was doing

11  anything else. Plaintiff testified that Julian Garcia gave her three or four angry looks

12  between October 2006 and June 2007. Plaintiff does not recall if she was concerned with

13  Julian Garcia following her or observing her away from work while she was working at the

14  superior court.

15      In April 2009, Plaintiff testified that she realized that Julian Garcia 1 and Julian

16  Garcia 2 were not the same person and that they did not look exactly alike. Plaintiff further

17  testified that Julian Garcia 2 is a little bit shorter and looks a little different from the side.

18  Plaintiff testified that both Julian Garcia 1 and Julian Garcia 2 looked approximately the

19  same age when she worked with them; however, upon realizing that they were two separate

20  individuals, one of them seemed more youthful.

21      Plaintiff alleges that Julian Garcia 2 stared at her in "kind of a semi-angry, intense

22  fashion" on two or three occasions. Pl.'s Dep. Exh. A at 38:23:39:8. Plaintiff considered

23  these looks to be sexually motivated. Julian Garcia 2 never made any threatening comments

24  to Plaintiff or asked her out on a date. During the two years that Plaintiff was employed at

25  Pima County Superior Court, Julian Garcia 2 made what Plaintiff considered to be a

26  flirtatious comment about a movie, put his arm around her, and allegedly watched her on the

27  security cameras. Plaintiff further alleges that Julian Garcia 2 acted uncomfortable around

28  her by shifting in his seat, and on one occasion sweating. Plaintiff testified that the flirtatious

behavior did not make her feel wholly uncomfortable; however, the glaring and moving security cameras did. Plaintiff did not make a sexual harassment claim against either Julian Garcia while employed at Pima County Superior Court, because she did not feel that it was a problem at that time.

Plaintiff obtained Julian Garcia's telephone number from a sticky note with the name "Julian" on it that had been left on her desk. Plaintiff testified that in June 2007 she called the number after she quit working at the court to say good-bye. Plaintiff and Julian Garcia chatted in a friendly manner for approximately fifteen (15) to twenty (20) minutes. Plaintiff testified that she called the telephone number from the sticky note three times, and spoke with Julian Garcia 1 on two (2) occasions and Julian Garcia 2 on one (1) occasion. Plaintiff believes that both Julian Garcia 1 and Julian Garcia 2 have been stalking her since she left the Pima County Superior Court. The records produced from the Pima County Sheriff's Department contain only one Julian Garcia in the pictures, and no one who Plaintiff recognizes as Julian Garcia 2.

### B. Plaintiff's Employment at Defendant Corporation.

Plaintiff began working for Defendant on June 18, 2007. Compl. ¶ 12. Plaintiff never saw Julian Garcia 1 at Defendant's property; however, Plaintiff testified that she saw Julian Garcia 2 on three different occasions. Other than Julian Garcia 1 and Julian Garcia 2, Plaintiff testified that there was no one outside of Defendant corporation who participated in any stalking related activities toward her. In addition to the Julian Garcias, Plaintiff testified that Patrick Ledger, Emery Silvester and Don Kimball sexually harassed her while she was working for Defendant. Plaintiff's claims that Julian Garcia 1 and Julian Garcia 2 engaged in behavior that constitutes sexual harassment. Her claims against Patrick Ledger, Emery Silvester and Don Kimball arise from their alleged awareness of the harassment by the Julian Garcias, failed to correct it, and essentially made it a condition of her employment that she submit to it. Neither Patrick Ledger, Emery Silvester, or Don Kimball ever made any comments to Plaintiff of a sexual nature or touched her inappropriately.

Plaintiff testified that she had two direct contacts with Julian Garcia 1 during her

employment at Defendant. Plaintiff further testified that both contacts allegedly occurred when she called the after-hours hotline, and after someone else initially answered the phone, Julian Garcia 1 took the phone and disguised his presence while purportedly speaking to her. Plaintiff believes that these alleged actions constitute sexual harassment because the behavior was designed to break her down emotionally.

The first of these alleged telephone calls with Julian Garcia 1 occurred in approximately March 2008 when Plaintiff called the after-hours line to let them know that she was going to be working late. Approximately an hour later, she called back to tell them that she was leaving, someone answered the phone and identified themselves, but Plaintiff does not recall the individual's name. Plaintiff was on her cellular telephone walking through the parking lot, and commented that it was really windy outside. After Plaintiff hung up the telephone, she testified that she had a sinking feeling that she recognized the voice as Julian Garcia 1, who was disguising his voice from her as part of the sexual harassment. All that Julian Garcia 1 said to Plaintiff during this call was that he could barely hear her because it was really windy. This conversation lasted approximately fifteen (15) seconds.

Plaintiff's second conversation with Julian Garcia 1 allegedly occurred in April 2008 when she again called the after-hours line to let them know that she would be working late. Someone answered the phone and identified himself, and Plaintiff said that she would be leaving in about an hour. Julian Garcia 1 then allegedly got on the phone and said, in an angry voice, "I'm going to hold you to that." Pl.'s Dep. Ex. A [Doc.70] at 96:14-97:4. Plaintiff responded jokingly, and did not immediately realize that she had spoken to Julian Garcia 1. This conversation lasted approximately five (5) seconds. An hour later, when Plaintiff called back to say that she was leaving, someone answered the phone and identified himself, but Plaintiff did not remember his name. Plaintiff said that she was leaving, and a second voice said "Yeah, get out of here. It's the weekend." *Id*. at 97:5-15. This conversation also lasted approximately five (5) seconds. Plaintiff testified that Julian Garcia 2 was the person who made this last comment.

Plaintiff did not make any complaints to anyone at Defendant corporation about these

- 4 -

two alleged telephone calls involving Julian Garcia 1 and Julian Garcia 2. Plaintiff testified that she saw Julian Garcia 2 in approximately September 2007, sitting alone in a white truck in Defendant's parking lot. Plaintiff was walking to the parking lot, and while approximately fifteen (15) to twenty (20) feet from the truck looked at Julian Garcia 2 for four (4) or five (5) seconds. Julian Garcia looked up at her, but Plaintiff does not recall whether or not they made eye contact. Plaintiff did not report this incident to Defendant.

In approximately March or April 2008, Plaintiff testified that she saw Julian Garcia 2 at Defendant's property in another employee's office. Plaintiff walked by, and saw him in her peripheral vision for maybe two (2) seconds. He did not say anything to her and she never asked Defendant's employee who the person was. Plaintiff did not tell Defendant or any of Defendant's employees that she saw Julian Garcia 2 in another employee's office.

On or about April 30, 2008, Plaintiff saw Julian Garcia 2 for a third time at Defendant's offices. At that time, he left a room immediately across from the conference room where she was seated. Plaintiff testified that she saw the person she initially believed was Julian Garcia 1, but who she now believes was Julian Garcia 2 with Stuart Washburn for approximately four (4) seconds. Julian Garcia 2 did not say anything to Plaintiff; he allegedly looked at her and then moved behind Mr. Washburn.

Additionally, Plaintiff claims that other employees also made comments to her. One day, when it was cold outside, Plaintiff was wearing a t-shirt and her nipples were showing. Jeremy Rutherford allegedly made a smirking remark to her about how cold it was outside. Plaintiff believes that Julian Garcia 2 may have told Rutherford to make a comment to Plaintiff about it being cold outside. Plaintiff did not complain to anyone about Rutherford's comment.

*C. Harassment Complaints*

In October 2007, Plaintiff discussed the alleged stalking for the first time with someone at Defendant corporation. This discussion was with her supervisor, Corporate Counsel Patrick Ledger, in his office. Plaintiff testified that she generally told Ledger that she was concerned with things that were happening at her apartment and that she was

considering breaking her lease and moving because of it. Plaintiff also asked if Julian Garcia was on the premises at Defendant corporation, because she was concerned that it might be happening at work. Ledger allegedly said that he had never heard of Julian Garcia, asked Plaintiff is she was being stalked, and asked if they should move her to Sierra Vista. Plaintiff alleged that Ledger asked what happened and she said that she was concerned that her privacy was being violated. Plaintiff testified that at the end of the day Ledger came to her office and asked if she was going to be okay. He also allegedly said that there were worse things that could happen like being homeless. This exchange made Plaintiff think that he knew her stalker and was concealing it from her. Plaintiff does not recall going into any details with Ledger at that time, because she did not want to appear to be complaining about nothing. Furthermore, she did not want Ledger to think that he was responsible for something that was happening at her apartment.

Plaintiff did not tell Ledger about allegedly seeing Julian Garcia in Defendant's parking lot. Plaintiff did tell Ledger that people were making comments to her at Defendant corporation that made her wonder if Julian Garcia was there. She was not specific about these comments. Plaintiff did not ask Ledger to do anything during this conversation. Moreover, she considered it notification that she was having her privacy invaded in her personal life and was concerned that it was happening at work. Plaintiff testified that she was not trying to raise a complaint at this time, nor did she consider her conversation with Ledger to have been a complaint.

After the conversation with Ledger, Plaintiff's next conversation with someone at Defendant corporation about any alleged stalking was a discussion with Human Resources Director Emery Silvester in February 2008. The conversation with Silvester occurred after the February 2008 telephone conversation with Julian Garcia in which he allegedly yelled at her. Plaintiff testified that she let Silvester know that she had a hostile interaction with a former co-worker outside of work and asked to be notified if anything related occurred at Defendant corporation. Silvester allegedly asked Plaintiff if her former co-worker worked at Defendant corporation, and she responded that she did not know, but that it would be a

problem if he did. Plaintiff did not give Silvester her former co-worker's name because she did not want to come on too strong. Plaintiff testified that she wanted Silvester to let her know if anyone did anything strange or unprofessional like spying on her, asking people about her, making threats towards her, or intentionally keeping his presence hidden from her.

Also in February 2008, Plaintiff had a second conversation with Ledger in which she told him that she saw Julian Garcia at her apartment and was concerned for her safety. She testified that she wasn't asking him to do anything because it involved something that allegedly happened away from work. Plaintiff did not tell Ledger that anything specific was happening at work at this time. Again, Plaintiff did not consider the conversation with Ledger to be a complaint.

On or about April 30, 2008, when Plaintiff allegedly saw Julian Garcia 2 with Stuart Washburn, another employee, she asked employee Shane Sanders what Julian Garcia was doing there. Sanders responded that he only knew a Dave Garcia, and did not know any Julian Garcia. Plaintiff asked Sanders about Julian Garcia because she allegedly saw Julian Garcia in his area. Plaintiff did not speak with Ledger about Julian Garcia. Additionally, Plaintiff believed that Ledger was not being forthright about Julian Garcia because of Ledger's previous denials about knowing Julian Garcia. Plaintiff also thought Ledger was acting nervously and strange. Despite Ledger checking in with Plaintiff, asking how she was doing and telling her to report anything that happened, Plaintiff believed that he was being insincere and that he was torturing her into leaving the company. Plaintiff does not know why Defendant would have any interest in torturing her into leaving.

On May 15, 2008, Plaintiff made a written complaint about Julian Garcia to Human Resources Director Emery Silvester. Plaintiff believed that a person was being allowed to spy on her and her purpose in writing the letter to Silvester was for Defendant to investigate her claims and get the harassment to stop. Plaintiff testified that she was making a sexual harassment complaint. Plaintiff's letter states that she observed a former co-worker, Julian Garcia, exiting the system control area on April 30, 2008, and that she had some concerns about him being present at Defendant corporation. Further, she asked Silvester to inform her,

in writing, whether Julian Garcia had worked there in any capacity in the last six months. She specifically told Silvester exactly what information she wanted and attached a photograph of Julian Garcia 1 to her letter. Plaintiff's letter states that she was certain that it was her former co-worker that she saw; however, she now states that the person in the photograph that she provided to Silvester was not the person whom she allegedly saw at Defendant corporation. Plaintiff concluded her letter by informing Silvester that she would be requesting a meeting to apprise him of some issues regarding her "previous working relationship with Mr. Garcia, which potentially could become presently relevant if he has since obtained reason to be routinely present here at the Cooperatives." Pl.'s Ltr. to Silvester 5/15/08 Ex. C [Doc. 70]. Plaintiff's letter did not mention her alleged sighting of Julian Garcia at Defendant corporation on two previous occasions or her alleged two previous telephone conversations with him. Plaintiff courtesy copied CEO Don Kimball on her May 15, 2008 letter in order to alert upper management to her concern. Plaintiff avers that she wrote the letter in accordance with Defendant's Harassment in the Workplace policy. This policy directs employees to "promptly notify an HR representative, his or her immediate manager, the next higher management official or an executive manager." Pl.'s SSOF, Exh. L § 3-14 at 2. Then "[u]pon receiving a complaint or being advised by a manager that violations of this policy may be occurring an HR representative will notify the President and Chief executive Officer (CEO) and the Senior Vice President and Chief Operating Officer (COO) of Sierra that such complaint has been received." *Id.* Plaintiff never spoke with Don Kimball about any alleged harassment issues, but Plaintiff believed that everyone already knew what was going on, but were acting like they did not know.

D. *Defendant's Investigation of Plaintiff's Complaint*

On May 16, 2008, Plaintiff met with Silvester to discuss her letter. She did not tell Silvester that the letter concerned the same individual that they had discussed in February 2008, because in Plaintiff's mind Silvester already knew. During that meeting, Silvester informed Plaintiff that there was no record of a Julian Garcia being recently employed by Defendant. On May 19, 2008, Plaintiff wrote a second letter to Silvester, attaching a clearer

- 8 -

photograph of Garcia and letting him know that she had delivered a printed copy of the photograph to Mary Mattson in the Human Resources Department. Plaintiff has subsequently testified that the person in the photograph that Plaintiff provided to Mattson and Silvester was not the person that she allegedly saw at Defendant corporation.

Plaintiff requested that Defendant's Human Resources Department check with Shane Sanders and Stuart Washburn to see if they recognized the individual in the clearer photograph. On May 22, 2008, Plaintiff forwarded a letter to Ledger via e-mail, and he responded by telling her that he would be happy to discuss it with her at any time. The letter to Ledger also included a color photograph of Julian Garcia and reiterated that she had seen him at Defendant corporation on April 30, 2008. Plaintiff did not mention that she had previously spoken to Ledger about Julian Garcia. Plaintiff explained to Ledger that she wanted to give Silvester a "heads-up" about potential issues. Plaintiff concluded her letter by asking if he had time to discuss a personal matter, as opposed to a work-related matter, with her in the event that Silvester and his staff still did not recognize Julian Garcia.

On May 23, 2008, Silvester delivered a letter to Plaintiff in her office. Silvester's letter outlined the steps that Defendant took to investigate Plaintiff's allegations as follows:

1.    I talked to my staff, Lauri Martin, Lanel Gamez and Mary Mattson and showed them the initial picture you had provided and a few days later the additional picture and each responded that they had never seen the person, in the picture or on the premises.

2.    We checked on the SAP System to see if a person by the name of Julian Garcia was or had been employed by the Cooperatives and we found no such employee listed.

3.    I had Lauri Martin contact Supplemental Solutions, a provider of temporary services for the Cooperatives, and asked them if they had a Julian Garcia employed by them. They checked and they responded they did not.

4.    I talked to Shane Sanders initially and then provided him the enhanced picture you had provided. He had Ernie Dunivan check with those on duty at the time of the reported sighting and no one knew the individual, or saw him, but would had [sic] if he had been there.

5.    Fifth I talked to Stuart Washburn and Jay Strickling in the Graphic Services area, who had both been in the dispatch area just prior to your reported sighting of Julian Garcia and both had not seen the individual in the picture or knew of the individual.

Silvester Ltr. to Pl. 5/23/08, Ex. "I" [Doc. 70]. In the letter, Silvester also reminded Plaintiff that the area where she allegedly saw Garcia was a secure area and that any non-employees would have to sign in and be accompanied by an employee to enter the area.

Plaintiff believes that the steps enumerated in Silvester's May 23, 2008 letter could have been taken, she also believes that Silvester was lying about the investigation that he conducted and its results. Based upon the information received from Plaintiff, Defendant only knew that Plaintiff was claiming that someone named Julian Garcia worked there and had been on the premises. Plaintiff now believes, however, that this individual was not the person in the pictures that she provided. Plaintiff admits that Defendant's response to her inquiries regarding Julian Garcia answered the literal requests of her correspondence; however, she maintains that Defendant did not address the larger issue of who this individual she saw was.

On May 23, 2008, Ledger invited Plaintiff to his office. Ledger told Plaintiff that no one knew Julian Garcia and that she should not have written her letter, that it was impossible for her to have seen him where she said that she saw him, that maybe something was wrong with her, and said that she needed the employee assistance program. They also discussed Plaintiff's previous concern that her phone and the computer in her apartment had been tampered with. Ledger told Plaintiff that she should not have copied the CEO on her letter, and that the matter appeared to suggest a lack of judgment and affected her credibility. Ledger told Plaintiff that the impact on her credibility would affect her ability to do her job. Plaintiff testified that she told Ledger that the person who she saw was either Julian Garcia or someone who looked just like him. Plaintiff further testified that she told Ledger that she copied the CEO on her complaint in accordance with the company's harassment policy.

Plaintiff does not recall if anyone suggested that she take any personal action against Garcia such as filing an injunction against harassment. Moreover, Plaintiff did not want to seek an injunction against Julian Garcia because she was concerned about retaliation and she did not have any witnesses to back her up. Plaintiff did not believe that Defendant was forthright in its response regarding her inquiry about Julian Garcia; however, she would not

have considered any response to have been forthright unless Defendant acknowledged that Garcia had been on the premises.

### E. *Plaintiff's Termination*

On May 27, 2008, Ledger informed Plaintiff of her termination. Plaintiff sent Ledger an e-mail regarding her termination, requesting a written explanation for her termination. On June 19, 2008, Plaintiff received a response from Ledger. In his e-mail to Plaintiff, Ledger explained that the memorandum that she had written regarding Julian Garcia was "in form, substance, and in the manner in which it was distributed demonstrated poor judgment. The claims raised in your memo were thoroughly investigated and were not corroborated by anyone present during the alleged events. These conclusions were discussed with you by the Human Resources Manager, who asked you for further substantiation, which you failed to provide. You were strident and generally uncooperative during this conversation and refused to accept his recommendation to avail yourself of the employee assistance program." Ledger E-mail to Pl. 6/19/08, Ex. "K" [Doc. 70]. Ledger went on to state that Plaintiff:

> [F]ailed to provide a satisfactory explanation of why you issued the memo, why you raised your concerns in the manner that you did, and why you did not cooperative [sic] with the investigation. You indicated little or no willingness to modify your conduct or practice in this regard. I expressed to you that in my view, as your manager, these actions did not appear to conform with established policy and procedures, were imprudent, and demonstrated poor judgment. I noted that it was my opinion, and the opinion of the CEO and other managers involved in the investigation of your claims, that your actions suggest that you do not possess the judgment and credibility necessary to perform in-house staff attorney duties.

*Id.* Plaintiff admits that the quoted section accurately reflects the contents of the letter provided to her; however, she disputes the accuracy of the contents of Ledger's e-mail because she believes that she complied with Defendant's Harassment in the Workplace Policy and reacted calmly and reasonably when questioned by Defendant's HR Director and her supervisor.[1] Plaintiff testified that she was reluctant to give the company more

---

[1] The Court notes that it was not Plaintiff's responsibility to forward her complaint to the CEO. This initiative violated the Harassment in the Workplace Policy as described *supra*.

information because she believed that they already knew enough.  Further, Plaintiff felt that she had provided Silvester with enough detail to conduct an investigation and did not need to tell him everything that she knew.  Plaintiff also testified that when Silvester pressed her for more information, she felt that he was going to use it to further exploit her, so she refused to give it to him.

### F. Defendant's Employment Policies

Plaintiff received a copy of all Defendant's policies, kept them in a binder in the office, and referred back to them throughout her employment.  Prior to making her complaint in this case, Plaintiff reviewed Defendant's sexual harassment policy.  Plaintiff understood that the purpose of the Employee Complaint Resolution Policy was to provide an orderly method to process employee complaints at Defendant corporation.[2]  The Employee Complaint Resolution Policy provides that all problems or complaints raised by employees "will be handled in accordance with an established step-by-step procedure whereby such employees may bring complaints to succeeding levels of management until the problem has been resolved or until the problem or complaint has passed through the levels of management."  Def.'s Security Procedure, Ex. "L" [Doc. 70] at  3-12.  The Employee Complaint Resolution Policy states that the CEO is the court of last resort in the complaint resolution policy.  Plaintiff asserts that her complaint was brought under the Harassment in the Workplace Policy which sets forth a different procedure.

Defendant's Harassment in the Workplace Policy generally defines sexual harassment to include unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature.  Defendant's Harassment in the Workplace Policy gives various examples of prohibited harassment, makes clear that no harassment will be tolerated,

---

[2]Plaintiff disputes this statement. She asserts that she was promoted from paralegal to staff attorney in January 2008, she had not received any reprimands and that she continued to perform her job duties without incident until she received the verbal warning from her supervisor on May 28, 2008.  These facts, however, have nothing to do with the complaint resolution policy.

specifically details what employees are to do if they believe that they are being harassed, discusses the complaint procedures, explains that anyone who has engaged in any harassment will be subject to disciplinary action, which may include termination, and expressly prohibits any retaliation against any employee who makes a harassment complaint.

Plaintiff admitted that she copied the CEO on her complaint in May 2008 prior to speaking with either Silvester or Ledger about it. Plaintiff maintains that there is nothing wrong with the way she handled her complaint. Plaintiff agrees that as an employee and in-house attorney at Defendant that she would be subject to disciplinary action if she violated company policy.

Plaintiff testified that she considers the stalking the she was allegedly subjected to at Defendant corporation to have been sexually motivated. Further, Plaintiff testified that she considers Julian Garcia 2's mere presence at Defendant corporation, and the fact that it was allegedly being hidden from her, to constitute sexual harassment. Plaintiff believes that all the innuendo listed in her corporate deposition notice was suggested to Defendant's employees by someone else because it would be fun to do to her. Plaintiff did not complain to Silvester or Ledger about any of the comments listed as innuendo in her corporate deposition notice because she was still trying to get them past the first step of admitting that something was going on. Plaintiff believes that Ledger was already aware of all the innuendo because she believes that he knows Julian Garcia 1 and/or Julian Garcia 2 because she heard him call someone Julie on the phone once and she once heard him talking about someone with short black hair. Plaintiff does not have any evidence that Silvester knew about any of the innuendo listed in her corporate disclosure statement.

### G. Alleged Retaliation by Defendant

Plaintiff testified that she believes that she was terminated for complaining about sexual harassment because she was terminated eight or nine days after making her complaint. No one told Plaintiff that she was being terminated for making a complaint, but rather told her she was being terminated for the way she handled the complaint process. Plaintiff has

not offered any evidence that she was terminated for making a harassment complaint.[3] None of Defendant's employees have told her that she was fired for making a harassment complaint and she has not seen any documents indicating this reasoning.[4]

### H. Alleged Disability Discrimination

Plaintiff does not consider herself to have a disability. She believes that she was fired because Defendant perceived her as disabled because, in May 2008, Ledger allegedly made a comment to her about schizophrenia and called her paranoid. Silvester also allegedly called her paranoid and they mentioned the employee assistance program. Plaintiff does consider herself to be a little paranoid. Plaintiff continues to believe that Ledger knows more than he has told her regarding the reasons for her termination, but has yet to obtain that evidence. Plaintiff further believes that Ledger was not being honest with her about the reasons for her termination because she disagrees with them and believes that she did not do anything unreasonable.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that

---

[3]Plaintiff disputes this statement, arguing that she made the complaint in accordance with Defendant's Harassment in the Workplace Policy. Moreover, she urges that she remained calm during the meeting with Defendant's management, but was berated by her supervisor. Plaintiff's subjective intent to complain pursuant to Defendant's Harassment in the Workplace Policy and her demeanor during subsequent meetings fail to rebut Defendant's reasons for firing her.

[4]Plaintiff disputes this statement because Ledger's May 23, 2008 e-mail acknowledges that Plaintiff was referring to her May 15, 2008 letter as a harassment complaint made under Defendant's Harassment in the Workplace Policy. This, however, does not controvert the statement that the complaint was not why she was fired.

a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment. *Id*. In order to withstand a motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 252. The United States Supreme Court also recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

## III.    ANALYSIS

Plaintiff's Third Amended Complaint alleges six (6) separate causes of action as follows: (1) Sexual Harassment in Violation of Section 703(a) of Title VII, 42 U.S.C. 2000e-2(a); (2) Retaliation in Violation of Section 704(a) of Title VII, 42 U.S.C. 2000e-3(a); (3) Discrimination/Harassment Based on Disability in Violation of the ADA, 42 U.S.C. 12102, 12111, and 12112; (4) Discrimination/Adverse Employment Actions Based on Disability in Violation of the ADA, 42 U.S.C. 12102, 12111, and 12112; (5) Threats, Coercion, and/or Intimidation in Violation of the ADA, 42 U.S.C. § 12203(b); and (6) Retaliation in Violation of the ADA, 42 U.S.C. § 12203(a). Defendant has filed its summary judgment motion on all claims.

### A.  *Count One Hostile Work Environment*

Plaintiff's first claim alleges discrimination by Defendant based on sex, in which she was "subjected to physical and/or verbal conduct of a sexual nature at her workplace." Pl.'s 3d Amended Compl. [Doc. 29] at ¶ 65. Title VII of the Civil Rights Act of 1964 provides that:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). "Sexual harassment falls into two major categories: hostile work environment and quid pro quo." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000) (citations omitted). "A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Id.* A quid pro quo claim occurs "where a supervisor demands sexual favors in return for a job benefit." *Id.*

In order to prevail on a hostile work environment claim, Plaintiff must show that her "workplace [was] permeated with 'discriminatory intimidation, ridicule, and insult . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). The conduct must create an objectively hostile or abusive work environment, and the victim must subjectively perceive the environment to be abusive in order to implicate Title VII. *Id.* at 21-2, 114 S.Ct. at 370. The Ninth Circuit recognizes that "an employer may be held liable for sexual harassment on the part of a private individual . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *See also Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002).

There is no doubt that Plaintiff subjectively perceived a hostile or abusive work environment. The objective component is assessed using a totality of the circumstances test. *See Brooks*, 229 F.3d at 923. Plaintiff maintains that several events constituted harassment while employed at Defendant. First, she had a telephone encounter with Julian Garcia 1 in

March 2008 when she called Defendant's after-hours line. Julian Garcia 1 got on the line and stated that he could barely hear her because it was windy outside. This conversation lasted approximately fifteen (15) seconds. Second, in April 2008, Plaintiff had another telephone encounter with Julian Garcia 1, again when she called Defendant's after-hours line. When Plaintiff stated that she would be leaving in about an hour, Julian Garcia 1 got on the line and stated angrily, "I'm going to hold you to that." Plaintiff responded jokingly, and did not immediately realize that she had spoken to Julian Garcia 1. This conversation lasted approximately five (5) seconds. An hour later, when Plaintiff called back to say that she was leaving, a second voice said, "Yeah, get out of here. It's the weekend." Plaintiff testified that Julian Garcia 2 made this last comment. Plaintiff did not complain to Defendant about any of these telephone conversations.

In approximately September 2007, Plaintiff testified that she saw Julian Garcia 2 sitting alone in a white truck in Defendant's parking lot. Plaintiff was walking to the parking lot and while approximately fifteen (15) to twenty (20) feet from the truck, she looked at Julian Garcia 2 for approximately five (5) seconds. Julian Garcia 2 looked up, but Plaintiff does not recall if they made eye contact. Plaintiff did not report this incident to Defendant.

In approximately March or April 2008, Plaintiff testified that she saw Julian Garcia 2 at Defendant's property in another employee's office. Plaintiff walked by and saw Julian Garcia 2 in her peripheral vision for approximately two (2) seconds. He did not speak to her, nor did she ask Defendant's employee who he was. Plaintiff never reported this incident to Defendant.

On or about April 30, 2008, Plaintiff saw Julian Garcia 2 leaving an office across from a conference room where she was seated. Plaintiff saw the individual for approximately four (4) seconds and initially believed that it was Julian Garcia 1, but now asserts that it was Julian Garcia 2. Julian Garcia 2 did not speak to Plaintiff, and allegedly looked at her, then moved behind Stuart Washburn, one of Defendant's employees.

Finally, Plaintiff states that a co-worker, Jeremy Rutherford, made a smirking remark

about the temperature, when Plaintiff was wearing a t-shirt.[5]  Plaintiff did not complain to anyone about Rutherford's comment.

Plaintiff first notified Defendant about stalking in October 2007.  At that time, Plaintiff informed her supervisor, Patrick Ledger, about Julian Garcia.  Ledger had never heard of Julian Garcia and asked if Plaintiff was being stalked and if she needed to be moved to a different office.  Plaintiff responded that "things happen around my apartment complex and that I was considering breaking my lease and moving from Tucson because of it."  Pl.'s Depo 10/27/10 at 119:20-120:6.  Later in the day, Plaintiff avers that Ledger checked in with her and commented that "there are worse things that someone could be, like homeless."  Plaintiff found the conversation strange and concludes from this that Ledger knew about Julian Garcia and was hiding or withholding information.

In February 2008, Plaintiff spoke with Human Resources Director Emery Silvester.  Plaintiff informed Silvester that she had a hostile encounter with a former co-worker and that she wanted to be notified if anything occurred related to the individual at Defendant corporation.[6]  Silvester inquired if the person was employed at Defendant corporation, and Plaintiff stated that she did not know, but that it would pose a problem for her if he was employed there.  Also in February 2008, Plaintiff spoke with Ledger for a second time and reported seeing Julian Garcia at her apartment and expressing a concern for her safety.  Plaintiff did not give Ledger any details, nor did she ask him to do anything because the issues were not occurring at the workplace.  Subsequently, after Plaintiff's March/April 2008 encounter with Julian Garcia, she asked employee Shane Sanders about Julian Garcia.[7]  Sanders stated that he did not know a Julian Garcia, only a Dave Garcia.  Plaintiff did not speak with Ledger about this incident.  Finally, on May 15, 2008, Plaintiff wrote to Silvester

---

[5]This comment was about Plaintiff's anatomy in light of the cold weather.

[6]Prior to Plaintiff's meeting with Silvester, she had called Julian Garcia 1 to tell him to leave her alone.

[7]Plaintiff saw Julian Garcia 2 in Sanders's work area.

requesting an investigation regarding Julian Garcia spying on her.

In total, there were three telephone encounters with and three physical sightings of the Julian Garcias, and one comment made by Rutherford that Plaintiff identifies as constituting harassment. These seven individual incidents over a one year period cannot be said to create a "workplace permeated with 'discriminatory intimidation, ridicule, and insult . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create and abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). There were no physical threats or humiliation, the conduct was infrequent and consisted of merely offensive utterances and random sightings. *See id.* (based on the totality of the circumstances, environment must unreasonably interfere with an employee's performance). Title VII is not a "general civility code," and therefore, "simple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998). As such, Plaintiff cannot meet her burden to sustain a *prima facie* case under Title VII.

### B. Count Two Retaliation under Title VII

Plaintiff's second claim alleges that Defendant retaliated against her because of her opposition to unlawful sexual harassment in the workplace. Pl.'s 3d Amended Compl. [Doc. 29] at ¶ 69. Section 2003e-3(a), 42 U.S.C., provides as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified or assisted, or participated in any manner in an investigation, proceeding, or other hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In order to maintain a retaliation claim under Title VII, Plaintiff "must show (1) involvement in a protected activity, (2) an adverse employment action and

(3) a causal link between the two." *Brooks*, 229 F.3d at 928. "Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action." *Id.* "Once the employer carries this burden, plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext." *Id.* "[A]n employer may be held liable for sexual harassment on the part of a private individual, . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *see also* 29 C.F.R. § 1604.11(e) (EEOC regulations reflecting this standard).

Plaintiff maintains that the May 15, 2008 complaint/request to Defendant's Human Resources Director "in accordance with Defendant's Harassment in the Workplace policy" constituted a protected activity. Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. 98] at 2. Although, Plaintiff may have believed that her letter was a sexual harassment complaint a review of this document indicates that she is requesting an investigation regarding her alleged sighting of Julian Garcia on Defendant's property. There is nothing to suggest that she was alerting Defendant of a sexual harassment complaint, or indeed any sort of harassment at all. As such, Defendant argues that this letter cannot represent a protected activity.

During oral argument, Plaintiff relied heavily on the Ninth Circuit Court of Appeals opinion in *Little v. Windermere Relocation, Inc.*, 301 F.3d 958 (9th Cir. 2002). Although this case recognizes that an employer may be held liable for the actions of a non-employee third party, it is inapposite here. In *Little*, the Plaintiff was raped by a client. *See id.* Upon reporting the rape to the corporate President, Plaintiff's pay was immediately cut. As such, Little's "employer effectively condoned [the] rape by a business colleague and its effects." *Id.* at 968. Windermere offered a non-discriminatory reason for Little's paycut; however, Little "tendered sufficient evidence, in addition to the proximity of events, to rebut this alleged reason." *Id.* at 970. The severity of the harassment coupled with Windermere's apparent failure to act are in stark contrasts to the facts in the present case.

Here, Plaintiff points to seven individual, innocuous incidents over a one year period.

When Plaintiff requested an investigation surrounding the presence of Julian Garcia on Defendant's property, Defendant acted immediately.  As outlined in Silvester's May 23, 2008 letter to Plaintiff, Defendant spoke with all of the people who may have had contact with Julian Garcia, as well as showing those individuals the pictures provided by Plaintiff, reviewed logs, and spoke to their temporary services provider, in an effort to determine whether Julian Garcia had been on Defendant's property.  Plaintiff contends that these items "may have been done, but . . . contend[s] that it was disingenuous, that [Defendant] knew that this Julian Garcia 2 was here."  Pl.'s Depo. 10/27/10, Exh. A [Doc. 70] at 188:20-190:18.  Plaintiff has not produced any evidence, however, to support her contention.  "In order to prove that she engaged in protected opposition, 'the opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.'"  *Folkerson*, 107 F.3d at 755 (9th Cir. 1997) (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)).

Plaintiff has not alleged any facts which would indicate that Defendant ratified or acquiesced to any alleged sexual harassment by Julian Garcia 1 or 2.  The facts demonstrate that Defendant took reasonable steps to address Plaintiff's concerns regarding the presence of Julian Garcia on its property.  As such, Plaintiff cannot meet her burden to demonstrate that she was engaged in a protective activity.[8]

### C. Counts Three and Four Discrimination/Harassment and Adverse Employment Action in Violation of the ADA

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show "that she: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of her disability."  *Snead v. Metropolitan Prop. & Cas. Ins. Co.*, 237 F.3d 1080,

---

[8]Additionally, Defendant has come forward with a legitimate, non-discriminatory reason for Plaintiff's dismissal.  Upon completing their initial investigation regarding Julian Garcia, Defendant sought additional information from Plaintiff.  Plaintiff refused to cooperate.  Plaintiff may not believe those reasons, but she cannot come forward with any evidence to demonstrate that they are merely pretextual.

1087 (9th Cir. 2001); *Kennedy v. Applause, Inc.*, 90 F.3d 1477 (9th Cir. 1996).[9] "Under subsection (C), individuals who are 'regarded as' having a disability are disabled within the meaning of the ADA." *Sutton v. United Air Lines*, 527 U.S. 471, 489, 119 S.Ct. 2139, 2149, 144 L.Ed.2d 450 (1999). Further, under subsection (C), a covered entity must either believe "that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment, when, in fact, the impairment is not so limiting." *Id.*, 119 S.Ct. at 2150. "[A] plaintiff alleging a 'regarded as' claim [must] provide evidence of the employer's 'misperception,' or subjective belief that the plaintiff is substantially impaired." *Walton v. U.S. Marshals Service*, 492 F.3d 998, 1006 (9th Cir. 2007). Moreover, "a plaintiff must show that her employer regards her as substantially limited in a major life activity and not just unable to meet a particular job performance standard." *Id.* at 1006 (citations omitted). As such, "in order to state a 'regarded as' claim a plaintiff must establish that the employer believes that the plaintiff has some impairment, and provide evidence that the employer subjectively believes that the plaintiff is substantially limited in a major life activity." *Id.*

In this case, Plaintiff states that Defendant's Human Resources Director told her that she is "paranoid" for writing the May 15, 2008 memo and suggested that she participate in Defendant's employee assistance program. Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. 98] at 6. This coupled with her supervisor's suggestion that perhaps she was "schizophrenic" leads Plaintiff to assert that Defendant mistakenly believed that she was disabled.[10] Plaintiff does not demonstrate how these comments show that Defendant mistakenly believed that she

---

[9]The Court notes that the ADA Amendments Act of 2008, which altered the ADA's definition of disability, does not apply to alleged acts occurring before January 1, 2009. *See Becerril v. Pima County Assessor's Office*, 587 F.3d 1162 (9th Cir. 2009).

[10]Plaintiff also avers that a co-worker, Emily Regis, came into Ledger's office when Ledger made the comment about schizophrenia. Pl.'s Resp. to Def.'s Mot. for Summ. J. [Doc. 108] at 14. Plaintiff asked Ms. Regis if Plaintiff had ever acted like she had schizophrenia, to which Ms. Regis responded that shed did not know her well enough. *Id.* The Court finds that this statement does not support a finding of Defendant regarding Plaintiff as being a schizophrenic.

was "substantially limited" in a major life activity. "If the plaintiff does not have direct evidence of the employer's subjective belief that the plaintiff is substantially limited in a major life activity, the plaintiff must further provide evidence that the impairment imputed to the plaintiff is, objectively, a substantially limiting impairment." *Walton*, 492 at 1006. Even if the Court were to agree that Defendant mistakenly believed Plaintiff to be disabled, there is no evidence of discrimination because of that disability. Defendant has given legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff has not produced any evidence to demonstrate pretext.[11] *See Snead*, 237 F.3d at1093 (applying *McDonnell Douglas*[12] burden shifting to ADA claims). Accordingly, Plaintiff's claim must fail.

### D.  Counts 5 and 6 Threats, Coercion and/or Intimidation and Retaliation in Violation of the ADA

Plaintiff alleges that she suffered "threats, coercion, and/or intimidation by Defendant" and retaliation while engaged in a protected activity under the ADA. Pl.'s 3d Amended Compl. [Doc. 29] at ¶¶ 85 & 88. In order to establish a *prima facie* case under 42 U.S.C. § 12203, Plaintiff "must show (1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brooks*, 229 F.3d at 928; *See also Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003) (applying the *Brooks* standard to ADA claims). As discussed *supra*, Plaintiff cannot establish that she was involved in a protected activity. Again, the Court notes, "[i]n order to prove that she engaged in protected opposition, 'the opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.'" *Folkerson*, 107 F.3d at 755 (9th Cir. 1997) (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)). Moreover, there is no evidence to support Plaintiff's claim that she was threatened or coerced by

---

[11]Plaintiff's refusal to cooperate in Defendant's further investigation of her claims led Defendant to question her judgment. This, coupled with her refusal to follow protocol placed Plaintiff's ability to represent the company as an attorney in doubt.

[12]411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

Defendant. Accordingly, Plaintiff cannot establish a *prima facie* case under the ADA. Because Plaintiff has failed to meet her initial burden, the Court does not reach the *McDonnell Douglas* burden shifting analysis appropriate for a retaliation claim.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Doc. 69] is GRANTED.

DATED this 6th day of September, 2011.

_____
Cindy K. Jorgenson
United States District Judge